Ellis W. McINNIS et ux *v.* COOPER
COMMUNITIES, INC.

80-254                                        611 S.W. 2d 767
Supreme Court of Arkansas
Substituted Opinion on Rehearing
delivered February 23, 1981

504

*Cockrill & McGhee*, for appellants.

*Richard H. Smith* and *Catlett & Henderson*, for appellees.

FRANK HOLT, Justice. Appellants brought suit to have a note and mortgage declared usurious and void, in violation of Art. 19, § 13 of the Constitution of Arkansas (1874), which restricts the charge of interest to 10% annually. Appellee responded that the loan, bearing 12% interest, was valid, because it came within the preemptive provisions of the Depository Institutions Deregulation & Monetary Control Act of 1980, 94 Stat. 132. Both parties filed a motion for summary judgment, which the chancellor granted in favor of appellee, holding that the note and mortgage were valid under the provisions of that congressional act. In reversing we held that § 501 (a) (1) of the act was an invalid legislative exercise of congressional power pursuant to the commerce clause. Succinctly, the issue on rehearing is the validity of this congressional act which suspends the state's usury laws and, also, reserves to a state the right to veto by overriding the act. Further, if valid, is appellee's loan to appellant usurious? We hold the act valid and appellee's loan to appellants is not usurious.

Appellants purchased a residential lot in Hot Springs Village, Garland County, from appelee on July 31, 1980. They paid $650 down on the $6,500 purchase price, executing a note for the $5,850 balance with interest of 12% per annum, payable in 120 monthly installments of $84.94, beginning September 16, 1980. To secure the payment of this note, appellants executed a first mortgage to appellee on this

lot. The parties stipulated that all lots sold by appellee at Hot Springs Village and Bella Vista Village in Arkansas are restricted to residential use by a recorded Declaration of Covenants and Restrictions. Furthermore, appellee, in its motion for summary judgment, included an uncontroverted affidavit showing it qualifies as a creditor as defined by 15 U.S.C. § 1602 (f) and stating it regularly extends credit in connection with its sales of residential real property, secured by a mortgage on the propery; the property is real estate improved or to be improved by a dwelling structure or structures; appellee from April 1979 to August 31, 1980, made residential real property loans aggregating $35,778,000, and based upon its history, will annually make residential real estate loans aggreagating more than one million dollars.

Under § 501 (a) (1), the 10% urusy limit in our state would not apply to any loan, mortgage, credit sale, or advance which is secured by a first lien on residential real property, among other things, that is made after March 31, 1980. That section further sets out the requirement that such loan or mortgage must meet the description in § 527 (b) of the National Housing Act (12 U.S.C. 1735f-5 (b) [1976]) of a "federally related mortgage loan". That section defines such a loan as one which is secured by residential real property designed principally for the occupancy of one to four families (this occupancy requirement being deleted for purposes of this legislation, see § 501[a] [1] [C] [i]), and meets certain other criteria, as pertinent here being made by a "creditor", as defined in § 1602 (f) of Title 15 (15 U.S.C. § 1602 (f) [1976]), and who makes or invests in residential real estate loans aggregating more than one million dollars per year. Section 1602 (f) defines "creditor" as one who regularly extends, or arranges for the extension of, credit "which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, whether in connection with loans, sales of property or services, or otherwise." This applies "to any such creditor, irrespective of his or its status as a natural person or any type of organization." As indicated, we are of the view appellee has sufficiently met the requirements of the act.

We now consider whether this congresional act

preempts our usury laws as to those areas covered by the act. Congress has power to do this by virtue of the Supremacy Clause, Art. 6, Cl. 2, Constitution of the United States. Congress has broad powers to legislate under the Commerce Clause of our Federal Constitution, Art. 1, § 8, Cl. 3, this power to legislate falling into, *inter alia*, the category concerning the regulation of activities affecting commerce. *Perez* v. *United States*, 402 U.S. 146 (1971). The U.S. Supreme Court has often noted the broad scope that Congress has to regulate economic affairs which have an impact on several states. In *American Power Co.* v. *S.E.C.*, 239 U.S. 90 (1946), the court stated:

> ... we reaffirm once more the constitutional authority resident in Congress by virtue of the commerce clause to undertake to solve national problems directly and realistically, giving due recognition to the scope of state power. That follows from the fact that the federal commerce power is as broad as the economic needs of the nation.

Certainly, it cannot be disputed that congressional regulation of the availability and flow of money between the various states comes within the scope of the Commerce Clause.

The power of Congress to thus regulate under the Commerce Clause extends even to wholly intrastate activities which, standing alone or combined with like conduct of others similarly situated, might be a restraint of commerce or which might interfere with or injure interstate commerce. *Fry* v. *United States*, 421 U.S. 542 (1975). See also *NLRB* v. *Fainblatt*, 306 U.S. 601 (1939) (strike as affecting the movement of manufactured goods in interstate commerce.) This power includes intrastate activities which so affect interstate commerce as to make regulation an appropriate means to the attainment of a legitimate end, the regulation of interstate commerce. *Katzenbach* v. *McClung*, 379 U.S. 294 (1964). In *Katzenbach* the court noted the volume of goods purchased out-of-state by the family restaurant was insignificant in comparison with the total foodstuffs moving in commerce, but its contribution combined with that of many others similarly

situated was far from trivial. See also *United States* v. *Wrightwood Dairy Co.*, 315 U.S. 110 (1942), (regulation of price of intrastate milk, as it was sold in competition with interstate milk and thus affected the price of the latter); and *Wickard* v. *Filburn*, 317 U.S. 111 (1943), (regulation of wheat grown for home consumption as the need would otherwise be satisfied on the open market; thus, it competes with wheat in commerce). Recently, in *Neikirk* v. *State*, 260 Ark. 526, 542 S.W. 2d 282 (1976), we held that a 55 m.p.h. speed regulation, established by Congress, subject to rejection by the states, was not violative of the Commerce Clause, nor the guarantee of due process, or equal protection.

If the class of activities is within the power of Congress to regulate under the Commerce Clause, the courts cannot "excise, as trivial, individual instances of this class." *Maryland* v. *Wirtz*, 392 U.S. 183 (1968); *Perez* v. *United States, supra*; see also *Katzenbach* v. *McClung, supra*, that it is enough if the class of activities affects commerce, a case-by-case determination not being required. Thus, proof that this particular loan had a significant impact on interstate commerce is not necessary. The purpose of the Commerce Clause is to ensure a national economy free from unjustifiable local entanglements. *National Bellas Hess, Inc.* v. *Department of Revenue of the State of Illinois*, 386 U.S. 753 (1967). A court should not substitute its judgment for that of Congress that the particular class of intrastate activities affects interstate commerce unless the relation and its effect are clearly nonexistent. See *Stafford* v. *Wallace*, 258 U.S. 495 (1922). There is a strong presumption of validity of an act of Congress. *United States* v. *National Dairy Products Corp., et al*, 372 U.S. 29 (1963). We have recognized that the character of regulations of commerce is left to the discretion of Congress, and it is "the duty of the courts to resolve all doubts in favor of the legislative action." *St. Louis & San Francisco R.R.* v. *Heyser*, 95 Ark. 412, 130 S.W. 541 (1910). This discretion is limited only by the fact that the means chosen to regulate must be reasonably adapted to the regulation of interstate commerce. *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U.S. 241 (1964).

We now note that the testimony during the congressional hearings was that state usury laws have a signifi-

cant impact on the economy by diverting credit out-of-state, stagnating the housing industry and resulting in the inability of the farmers and small businessmen to borrow, all of which distorts and adversely affects local and national economy. See 126 Cong. Rec. H. 2273-2275 (daily ed. March 27, 1980); 126 Cong. Rec. S. 3170 - 3176 (daily ed. March 27, 1980). The legislative history of an act, as reflected by congressional hearings, is most significant.

In *Stephens Security Bank* v. *Eppivic Corp*, 411 F. Supp. 61 (W.D. Ark. 1976) (affirmed 553 F. 2d 102 [8th Cir. 1977]), the court had before it the question of whether the "Brock Bill," Title II of P.L. 93-501, October 29, 1974 (predecessor to the Monetary Control Act here), preempted the Arkansas 10% constitutional usury limitation as to loan of $25,000 or more made by national banks, FDIC-insured state banks and FSLIC-insured savings and loan associations for business and agricultural purposes. The court found the bill preemptive. The court's observations there are applicable here:

> The legislative history reflects findings that the financial community in the affected states has suffered because of the high price it must pay for money as opposed to the limitation on the interest it may earn . . .

> Testimony indicated that the usury ceilings were impacting heavily on the construction, small business and agricultural areas of the economies of the states, with a likelihood of severe shortage or unavailability of credit to these classes in the economy. The report states, '. . . the evidence before the committee indicates that . . .[u]nless remedial action is taken in the very near future, these states could suffer from unemployment and business failures.

> These are not local problems. It was found that there were substantial effects on interstate commerce by reason of outflow from the states of capital, unemployment and consequent direct and indirect effects on the Treasury through benefits to the unemployed, and a reduction in interstate trade and agricultural production. . .

Here, the Committee report with respect to the Monetary Control Act states:

> The Committee finds that where state usury laws require mortgage rates below market levels of interest, mortgage funds in those states will not be readily available and those funds will flow to other states where market yields are available. This artificial disruption of funds availability not only is harmful to potential homebuyers in states with such usury laws, it also frustrates national housing policies and programs.

S. Rep. No. 368, 96th Cong., 1st Session.

The "Brock Bill" also had a provision, as does this legislation, allowing the state legislature to reassert the state's usury provision and, thus, override the federal legislation. The court in *Stephens* quoted the committee report that this provision reflected "a congressional policy of permitting a state the primary opportunity to determine its usury statutes . . . ." This same language appears in the committee report with respect to the act under consideration here.

An override provision has been a part of other acts including the Taft-Hartley Act, see 29 U.S.C. § 164 (b); the Federal Bankruptcy Code, 11 U.S.C. 522 (b); and the Housing and Rent Act of 1947 as amended, 50 U.S.C. App. § 1881 *et seq.* This provision in the Taft-Hartley Act was upheld in *Retail Clerks International Association* v. *Schermerhorn*, 375 U.S. 96 (1963), in which the court noted any resulting conflict between state and federal law would be "conflict sanctioned by Congress with directions to give the right of way to state laws barring the execution and enforcement of union-security agreements." See also *Neikirk* v. *State, supra.* Thus, the override provision, here, merely reflects a desire or accommodation by Congress to allow the states to continue to assert their usury limits if they so wish and does not reflect a lack of authority to legislate in this area. The methods which Congress employs to carry out its power are within its discretion. See *Carolene Products* v. *United States*, 323 U.S. 18 (1944). It is unquestioned that Congress may allow states to legislate in a field of commerce in which it has only partially exercised

its power to legislate. *Cloverleaf Butter Co.* v. *Patterson*, 315 U.S. 148 (1942). Of course, Congress may exercise its authority to legislate in whole or in part or it may refrain from exercising it at all. However, when it does choose to exercise its authority in an area previously deferred to the states, its actions preempt conflicting state legislation. *Cloverleaf Butter Co.* v. *Patterson, supra; Bus Employees* v. *Wisconsin Board*, 340 U.S. 383 (1951); and *Burbank* v. *Lockheed Air Terminal*, 411 U.S. 624 (1973). Consequently, the veto power reserved to the states, as here, does not invalidate the congressional act. The act is effective until our legislature deems it necessary to reinstate our 10% usury ceiling. So far, it has not seen fit to do so. Parenthetically, we note that our legislature adopted a resolution urging a reenactment of the "Brock Bill", a predecessor to the Monetary Control Act here. Senate Concurrent Resolution 44 (March 8, 1979).

The dissents assail the act as being a denial of due process and equal protection of the laws under our federal constitution because of its application only to those who make loans in excess of one million dollars. This particular issue was never presented to the trial court nor is it actually argued by appellant on appeal. Even constitutional issues, if raised for the first time on appeal, will not be considered. *Wilson* v. *Wilson*, 270 Ark. 485, 606 S.W. 2d 56 (1980); *Gross* v. *Gross*, 266 Ark. 186, 585 S.W. 2d 14 (1979); *Williams* v. *Edmondson & Ward*, 257 Ark. 837, 520 S.W. 2d 260 (1975); and *Kroha* v. *Kroha*, 265 Ark. 170, 578 S.W. 2d 10 (1979). See also *Dixon* v. *State*, 260 Ark. 857, 545 S.W. 2d 606 (1977). Here, suffice it to say, the dissents inject a gratuitous argument on an issue that was not before the trial court and, therefore, we do not consider it.

We hold the Monetary Control Act a valid exercise of congressional authority pursuant to the Commerce Clause and that the loan in question is not usurious. Therefore, the chancellor correctly awarded summary judgment in favor of appellee.

Affirmed.

SMITH, HICKMAN and PURTLE, JJ., dissent.

DARRELL HICKMAN, Justice, dissenting. The reconstituted majority in this case has, in my judgment, granted considerable license to the facts and law in reversing our decision of December 22, 1980. I file this dissent with the knowledge that it will not change any minds but perhaps it will in some regards clarify the issue.

The issue, as I see it, is whether a private real estate developer can avoid Arkansas constitutional provisions on usury through a federal law that deals in some regard with state usury laws.

First, it must be emphasized, as it was in our opinion dated December 22, 1980, that this is an appeal from a summary judgment. Cooper Communities, Inc., put on no evidence at all that it spent or received one dollar in interstate commerce. It put on no evidence at all that it had to borrow any money in order to stay in business. The facts, as they were presented, were that Cooper is an Arkansas real estate developer and it sold a lot in Arkansas to an Arkansan, took a promissory note from that individual and retained a lien on the lot. It was stipulated that Cooper sold lots in its real estate development aggregating over one million dollars in one year. By virtue of these facts alone it claimed that it qualified as a "creditor" under 15 U.S.C., § 1602(f), and, consequently can avoid Arkansas usury laws.

On appeal these facts were presented to us and Cooper relied solely on the interstate commerce clause of the United States Constitution as justification that this federal legislation preempted the Arkansas Constitution regarding usury.

In deciding whether this legislation was intended to preempt Arkansas law, as it is claimed in this case, we should be able to presume that Congress was fully aware of the usury provisions of the Arkansas Constitution which is unique among all the states. It provides for a penalty which forfeits the amount of the loan, not just the illegal interest charged or some other lesser penalty. For that reason, more than any other, it has been the subject of attack. It is one thing to make a loan where the only risk is the loss of a few dollars, which is

the case in most states, as opposed to a lender in Arkansas making a loan where the risk is losing the amount of the loan. This court has fairly and consistently applied that usury provision to institutions as well as individuals.

Clearly Congress can preempt state law in certain areas and no doubt interest is a matter where it could elect to preempt all state laws, but it is not an area where the federal government has exercised such a predominance that the state cannot act. The question is, was this particular provision of this act intended to preempt any state action?

Based on the facts we have before us, I cannot presume that Congress intended the result that the majority has reached. I reach that conclusion with some understanding of the reason for the legislation. The particular law in question, as its predessor known as the Brock Bill, was addressed primarily to banks and savings and loan associations. According to the legislative history of these laws, the need was primarily caused by the loss of funds across state lines to other states where the institutions were paying more interest on funds than Arkansas banks or institutions could.

Regarding banks and savings and loan associations the act seems to be nondiscriminatory in every regard. It applies equally to state and federal chartered banks. It does not appear to discriminate as to the amount of the loan or the size of a bank. The same is not true regarding the provision that Cooper relies upon to avoid the Arkansas Constitution. That portion of the law is decidely discriminatory and if Cooper is permitted to use that portion to avoid Arkanas law, it will result in the law being applied in an unequal manner to a substantial group of individuals and lenders in the State of Arkansas. That provision as applied to Cooper, and as the

majority holds, means that real estate developers who sell over a million dollars worth of property a year in Arkansas can avoid the usury provisions of the Arkansas Constitution. That is the way the majority defines "creditor." Also Cooper Communities claims it has "federally-related" business under the federal law simply because it keeps a lien on the land it sells. Most lenders keep a lien on land that is sold. If such an act is "federally-related" then brushing your teeth is federally-related. Cooper Communities offered no proof that it will lose any business because of the Arkansas law. Indeed it would seem to the contrary. Its sales should flourish since it cannot charge over ten percent. It offered no proof that it would lose any funds to other states or that it had to borrow money at more than ten percent. It offered no proof as to any reason why it should come under the protection of the federal law. By granting Cooper this protection the majority necessarily holds that all other individuals or businesses in this same classification (people who sell real estate lots) who do not do over a million dollars worth of business are stuck with Arkansas's usury law. That means that this court will have to tell that class of individuals that they must abide by Arkansas law. When it is all boiled down, it can only mean that one class is allowed to make more money than another class. One class is granted what may amount to the right to succeed in business while another class may well fail. I would suggest that it was not Congress' intention to preempt a state law which would work such a decidely unfair result.

Was this what Congress intended? There is no doubt that Congress recognized that its law could result in discriminatory treatment. For this reason the act granted state banks equal treatment with federal banks. Section 27 (a) of 94 Stat. 164 reads: *"In order to prevent discrimination against State chartered insured banks, . . ."* [Emphasis added.] There is no such provision that applies to that part of the act that Cooper seeks to use to avoid Arkansas law.

There is no doubt in my judgment that federal laws must, to some degree, be subject to the same tests as state laws when it comes to equal protection of the rights of citizens. While I can find no authority that says that the

Equal Protection Clause of the Fourteenth Amendment to the Constitution applies to the federal government, the United States Supreme Court has indicated that federal acts are not entirely free from some constitutional test of equal treatment. See *Bolling* v. *Sharpe*, 347 U.S. 497 (1954). Furthermore, the classification imposed by Congress in its laws must be a rational one and must be one that serves a proper governmental purpose. *United States Department of Agriculture* v. *Moreno*, 413 U.S. 528 (1973). Also, the class must be one in which all are treated equally. It could be said that all million dollar developers are treated the same but I doubt Congress intended any court to enforce that provision to a perverted result. Even if it did, I would submit that Cooper has failed to make a case to fall within the classification of "creditors." After all, we still decide cases on the basis of facts submitted to us and as we said in our opinion of December 22, 1980, we assumed that all the evidence was presented to the trial court that the parties intended to be presented.

There are several things this case is not. It is not a case where this court must decide if Arkansas's Constitution is unconstitutional and must be changed because of due process of law or some other constitutional guarantee. It is not a case where the federal government intended to enact legislation to totally dominate a field of law heretofore regulated by a state. I would submit that what we have here is one part of a piece of special interest legislation in an area, which may or may not have been introduced to obviate state law.

The majority's statement that Arkansas has not rejected this law is meaningless. To suggest that the people of Arkansas should have voted on this federal law and rejected it is nonsense. They did not know about the law. To suggest that the Arkansas General Assembly should have rejected this law is to say that it should have violatd the Arkansas Constitution. I cannot agree with the majority's premise that the law is binding on Arkansas in every regard simply because Arkansas did not act. Arkansas has acted for many years in retaining its usury provision and its constitution should only be overriden in a case where the intent is clear and the treatment is fair and equal for all affected.

Numerous *amicus curiae* briefs have been filed in this case, largely by businesses or enterprises that are not directly affected by our decision. I share their concern with the state of the law. I trust that they share my concern that this court is charged with the duty of enforcing the Arkansas and United States Constitutions in an equal any even-handed manner.

I would deny the rehearing.

JOHN I. PURTLE, dissenting. Although I generally agree with the dissent by Justice Hickman, I want to add a few words of my own. It is true, as the majority states, that the Supremacy Clause, Art. 6, Cl. 2 of the Constitution of the United States declares that the Constitution and the laws made in pursuance thereof are the supreme law of the land. I agree with this statement. I do not believe the Depository Institutions Deregulation & Monetary Control Act of 1980 was enacted pursuant to the United States Constitution. Congress may do only those things which the United States Constitution authorizes it to do. I cannot find any authority in the Constitution or the amendments thereto which I interpret to authorize the Congress to regulate interest rates between contracting parties in the various states. Any such authority must be read into some part of the Constitution. The majority seem to base their decision upon the Commerce Clause of Art. 1, § 8, even though they set out the Supremacy Clause as part of the opinion. The Commerce Clause states that Congress has power to:

(3) to regulate commerce with foreign nations, and among the several states, and with the Indian tribes; . . .

Certainly, nothing in the foregoing clause mentions usury or interest rates. The question then is: What is commerce? We all know that the shipment of goods and chattels across state lines is commerce. There must be some place where transations between parties are no longer a part of commerce. In my opinion, the limits have already been reached. The federal courts, including the United States Supreme Court, have gone far afield in classifying transactions and activities as coming under the Commerce Clause

Act, Art. 1, § 8, Cl. 3, United States Constitution. However, they have not yet gone so far as to declare a loan between two parties in Arkansas to be a part of commerce.

Art. 19, § 13, Arkansas Constitution, states:

All contracts for a greater rate of interest than ten percent per annum shall be void, as to principle and interest, . . .

The contract here in question undisputedly charged a rate of interest in excess of our constitutional limit. In fact, it has been determined that the case was a test case. Had this court been aware of this fact I believe we would not have considered it. In my opinoin, the Constitution of the State of Arkansas is binding upon this court until such time as it is shown that it conflicts with the United States Constitution or the laws passed by Congress in pursuance thereof. I do not believe the Depository Institutions Deregulation & Monetary Control Act of 1980 is such a law. How can it be said that an act which attempts to regulate interest between banks, savings and loan associations and qualified millionaires is a fair and reasonable law? Certainly, there is no justification for allowing a person or corporation which sells a million dollars' worth of property a year to charge over the legal rate of interest and prohibit individuals or corporations selling less than a million dollars a year from exceeding the constitutional limit on interest. There is an equal protection clause in the Fourteenth Amendment to the United States Constitution. Clearly, it cannot be argued that the act under consideration treats parties equally. I find no provision in either the state or federal Constitutions which provides a millionaire should be given different treatment from that of other citizens.

Until the people of Arkansas change their constitution, I will continue to uphold it unless I am convinced that there exists a clear conflict between it and the United States Constitution or a law passed by Congress in pursuant thereof. I believe the people of Arkansas have recently indicated an intention to retain their present constitutional provision

508

relating to interest rates. In any event, it is not the duty of this court to change the laws of the State of Arkansas and certainly not to strike down any provision of the Constitution unless it is specifically required under circumstances as set out above. Therefore, I would deny the rehearing.