McILROY BANK & TRUST *v.* SEVEN
DAY BUILDERS OF ARKANSAS, INC.

CA 80-466                    613 S.W. 2d 837

Court of Appeals of Arkansas
Opinion delivered April 8, 1981
[Rehearing denied May 6, 1981.]

122

124

*Rose Law Firm, P.A.*, by: *Webster L. Hubbell* and *Jerry C. Jones*, for appellant.

*Eichenbaum, Scott, Miller, Crockett, Darr & Hawk, P.A.*, by: *C. Richard Crockett* and *Frank S. Hamlin*, for appellee.

GEORGE K. CRACRAFT, Judge. Appellant, McIlroy Bank and Trust, brings this appeal from a judgment of the Circuit Court of Pulaski County in which it was found that a five year lease agreement entered into with the appellee, Seven Day Builders of Arkansas, Inc., on September 16, 1975, was in fact a conditional sale of equipment on which usurious interest had been charged and paid. On those findings the

trial court entered judgment under 12 U.S.C. 1831 (a) (b) for $48,771.82, double the amount of interest found to have been paid to appellant under the agreement. The court further found that though the action was originally brought in replevin, the leased equipment had been repossessed by self-help and not thereafter disposed of as provided by law and that failure to do so amounted to a conversion. On those findings the trial court entered judgment against appellant for the sum of $55,000, the market value of the equipment on the date of the taking, but refused to take into account or setoff against the judgment the sum of $32,661.89, which was found to be the balance due appellant under the contract. The court ruled that as appellee had been adjudicated a bankrupt prior to the entry of the judgment, appellant's claim for the balance due could only be asserted in the bankruptcy court.

Due to the numerous points of error urged by this appeal a preliminary recital of the facts would unduly lengthen this opinion. The facts pertinent to a determination of each point will be separately discussed.

I.

THE COURT DID NOT ERR IN FINDING THAT THE LEASE AGREEMENT WAS IN FACT A SE-CURITY TRANSACTION.

The threshold question is whether the contract by which appellant, McIlroy Bank and Trust, purported to lease certain equipment to appellee, Seven Day Builders, Inc., for a term of five years was in actuality an installment sales contract containing an excessive rate of interest. We are of the opinion that the preponderance of the evidence fully supports the trial court's finding that the purported lease was in fact a credit sale which provided for excessive interest and was subject to those penalties afforded under 12 U.S.C. 1831 (a) (b).

This case cannot in any material aspect be distinguished from Bell v. Itek Leasing Corporation, 262 Ark. 22, 555 S.W. 2d 1 (1977), in which the court held that an instru-

ment which purported to be a lease was in fact a financing transaction. In the case now under review, as in *Bell*, the appellant is a banking institution that does not engage in manufacturing or leasing of equipment, but is chartered by this state to perform banking functions. This lease, too, puts all of the risks upon the lessee. It provides that the rent would be paid without abatement for any reason and required the lessee to pay all taxes and insurance. It was testified that the lease was intended to be a "net lease" and in detailed language imposes all risk of loss on the lessee.

As in *Bell*, this contract provides the same remedies upon the lessee's default in the payment of rent as would be available to a conditional seller or to a mortgagee upon a similar deficiency. That is, the lessor can expressly declare all remaining payments to be due up to what would have been the term of this lease, whether or not the leased equipment or any part of it should have been repossessed, relet or sold. Thus, as in *Bell*, the lessee may be held responsible for rent not yet due.

The appellant attempts to distinguish this case from the controlling decision because there was no down payment required. Paragraph four of the document requires that the basic rent "shall be paid in advance." In *Standard Leasing Corporation* v. *Schmidt Aviation*, 264 Ark. 851, 576 S.W. 2d 181, the court in holding a similar transaction to be a cloak for usurious charges stated:

> The instrument then provided for thirty-six monthly rental payments of $107.65, with the first and last to be paid in advance — apparently as a down payment.

Although the contract under review does not specifically refer to a down payment, the trial court might conclude, as in *Standard Leasing*, that the requirement of the payment in advance of the basic rentals had that effect.

The appellant further attempts to distinguish the transactions because in *Bell* the lessee was found to have had the option of purchasing the equipment for a "normal amount" at the end of the lease. It is pointed out that the provisions in

this lease now before the court provided that the option to purchase was to be at a price "equal to fair market value" and that the "anticipated value would be $7500." It further provided for appraisal in the event the parties might not agree upon that value. There was, however, testimony before the court that the parties had agreed that the price would be $7500 but the provision for appraisal had been inserted to make certain that the transaction qualified under the Internal Revenue Code for such transactions. That sum was equal to ten percent of the original purchase price. In *Bell* the lease was silent with regard to the purchase of the property at the expiration of the lease, but there was oral testimony that it could have been purchased for ten percent of the price. In *Standard Leasing* the document in question specifically stated that there would be no option to purchase at the end of the term. However, there was evidence that lessor's representatives had stated to the lessee that at the end of the term the property would be vested in them absolutely. The court in both cases held that the trial court could infer from this testimony that the provisions of the lease with regard to the disposition of the property at the end of the term was a sham designed merely to cloak the usurious transaction.

We cannot find any material distinction between the document involved in this appeal and those in the two preceding cases. The trial court was correct in its determination that the document in question was in fact a financing transaction.

## II.

### THE TRIAL COURT PROPERLY FOUND THE TRANSACTION TO BE USURIOUS.

The proper statute to apply in determining both the existence of and penalty for usury is 12 U.S.C. 1831 (a) (b). That section permits a state bank to make loans at a rate of interest no higher than five percent in excess of the discount rate on ninety day commercial paper in effect in the Federal Reserve District where the loan is made and provides a penalty for the charge of excessive interest in double the amount of interest paid within two years of the commence-

ment of an action to recover it. Our Supreme Court has recently held that such acts of Congress effectively pre-empt state limitations and penalties in usury cases. *McGinnis* v. *Cooper Communities, Inc.*, 271 Ark. 503, 611 S.W. 2d 767 (1981).

Appellant next argues that the court erred in holding that the maximum rate of interest chargeable on that date was eleven percent and that the rate charged in the subject transaction exceeded twelve percent per annum. This issue was not presented to the trial court and cannot be raised for the first time on appeal. *Green* v. *Ferguson*, 253 Ark. 601, 562 S.W. 2d 89. However, we note that the parties stipulated that the discount rate on the date in question was six percent. The trial court's finding that eleven percent was the highest rate permissible was correct. On substantial evidence the court also found that the rate charged was in excess of twelve percent per annum. No one at any time questioned that the appellant expected to receive and did receive a yield of twelve percent on its investment.

III.

APPELLEE WAS NOT ESTOPPED TO RAISE THE QUESTION OF USURY.

The appellant contends that, in any event, the appellee corporation was estopped to raise the defense of usury because at the time the instrument was executed the drafting attorney, James Gallman, was also acting as attorney and as a corporate officer for appellee. The record does reflect that at the time he was a member of the firm which regularly represented the appellant bank and that he also represented the appellee corporation in which he was an officer and major stockholder. The appellant argues that because of the relationship the attorney maintained with the bank, any business transaction between the attorney and the bank was subject to close scrutiny and that the circumstances of the case require that appellee be estopped to assert this defense because of that interrelationship. This issue was not raised in the court below, and should not be considered by this court for the first time on appeal. *Green* v. *Ferguson*, supra.

In any event, for us to hold under these circumstances that appellee was estopped to assert these defenses would not only require that we disregard the fact that the attorney and appellee corporation were separate entities, but find fraud and overreaching where the record shows neither.

There is no evidence that the attorney drafted the instrument with a future defense of usury in mind or that he was influenced by any desire to gain unfair advantage for himself or appellee. The agreement was drafted two years before *Bell* was decided. There was evidence that the same form had been used by appellant in similar transactions with other customers and that it embodied terms not then uncommon in such agreements. There is no evidence in the record suggesting that he did not utilize the yield figure required by the bank or otherwise exerted any influence he might have had over the appellant other than obtain a "twelve percent yield" rather than the fourteen percent charged other customers in similar transactions. We find no conduct on the part of the attorney which, if imputed to the appellee because he was an officer of that corporation, would raise an estoppel to bar these defenses.

## IV.

### THE TRIAL COURT ERRED IN ITS COMPUTATION OF THE PENALTY FOR USURY.

Appellant next assigns as error the manner in which the judgment for excessive interest charges was calculated by the trial court. Upon finding that the total amount of interest paid during the life of the instrument was $22,597.36, the court entered judgment for double the amount or $48,771.82. 12 U.S.C. 1831 (a) (b) which authorizes this penalty in pertinent part is as follows:

> (b) If such greater rate of interest has been paid, the person who paid it may recover in a civil action commenced in a court of appropriate jurisdiction not later than two years after the date of such payment an amount equal to twice the amount of the interest paid from the state bank taking or receiving such interest.

The statute is clear in its terms. The remedy is provided only for those who bring a civil action to recover the penalty within two years of the payment of the excessive interest. Although no cases have been cited us in which the wording of this particular section has been expressly construed, the federal courts in applying similarly worded usury statutes have held that excessive interest paid more than two years before an action is brought cannot be recovered. *McCarthy* v. *Rapid City First National Bank*, 223 U.S. 493; *Hase* v. *Pittsburg National Bank*, 526 F. 2d 1083.

Appellee has first asserted its claim for usury under 12 U.S.C. 1831 (a) (b) in an amendment to its counterclaim filed on December 28, 1979. The recovery should therefore have been calculated only with reference to interest taken by the appellant subsequent to December 28, 1977. All claims based on interest paid more than two years before the claim was asserted were barred under the statute. We agree with appellant that the trial court erred in not so limiting the recovery.

V.

## THE TRIAL COURT ERRED IN CALUCLATING DAMAGES AWARDED APPELLEE.

In its brief the appellant asserted several points of error in the trial court's award of damages for conversion of the equipment. Several of these points are so interconnected that they will not be addressed separately in this opinion.

According to its terms the first payment under the agreement was due in November of 1975. Payments were shown to have been made until October 1978, at which time the appellee defaulted. For some period thereafter negotiations were conducted between the parties in an effort to arrive at a satisfactory discharge of the remaining obligation under the contract. On June 5, 1979, the appellee's attorney, James Gallman, who was no longer a stockholder or officer of appellee but who had guaranteed the obligation, communicated to the appellant bank that he had been successful in arranging financing with which the obligation of appellee on the equipment could be discharged. The appellant

refused to accept this offer unless other obligations were also discharged at the same time. On June 6, 1979, the attorney communicated this response to the then president of appellee corporation, relating that the bank had insisted that unless there was a complete payoff it would take the machine.

The following day the appellant filed an action in replevin seeking to repossess the equipment. Although the complaint and summons were served on the appellee and it was advised that a hearing on the order for delivery would be heard within five days, no such order was ever sought or obtained. On June 7th the machine was repossessed by self-help but was never disposed of by appellant. A year later at the time of the trial the equipment was still in appellant's possession, being used by it in connection with its own business. The trial court treated this action as failure to comply with the provisions of the statutes governing replevin actions and constituted a conversion. The trial court found that the fair market value of the equipment at the time of the taking was $55,000 and entered judgment against the appellant for that amount. While the trial court also found that the balance due appellant under the agreement was $32,-308.37, it refused to enter judgment against appellee for that amount or allow it to be setoff against appellee's judgment because it was then in bankruptcy.

Appellant argues that the trial court erred in these findings and that they were not required to proceed in the replevin action if the possession of the machinery could be obtained by self-help. We agree that the initial retaking was not wrongful. Self-help was authorized not only in the instrument but by Ark. Stat. Ann. § 85-9-503 (Supp. 1979), which provides that in taking possession of collateral the secured party can proceed without judicial process if it can be accomplished without breach of the peace. There was no evidence that it was not taken in such a manner. We further agree with the appellant that self-help and the replevin statutes are alternative methods for obtaining possession of collateral and that the initial election of a secured party to proceed by judicial process does not require that he pursue that remedy to a conclusion if possession can in the mean-

time be otherwise obtained. *Ellis* v. *Smithers*, 206 Ark. 247, 174 S.W. 2d 568.

The liability of the appellant here is not predicated upon its failure to proceed in the replevin action, but in availing itself of the alternative remedy provided by the commercial code, and thereafter failing to dispose of the collateral in the manner provided by that code.

The appellant seeks to excuse its failure to dispose of the collateral under Ark. Stat. Ann. § 85-9-505 (2) (Supp. 1979), which permits a secured party in possession to retain the collateral in satisfaction of the obligation under certain conditions. That section, however, requires that the secured party give written notice of such a proposal to the debtor unless he has waived that right in writing. If the secured party receives an objection from the debtor, or any other person entitled to receive that notification within twenty-one days after the notice has been sent, the secured party *must* dispose of the collateral under Ark. Stat. Ann. § 85-9-504. Only in the absence of a written objection pursuant to that notice may the secured party rightfully retain the collateral in satisfaction of the debtor's obligation.

Appellant contends that such notice was sent to the debtor and refers to a letter dated June 6, 1979, written by James Gallman to the then president of Seven Day Builders, Inc. This letter could not be considered a compliance with the written notice requirements for several reasons. First, it was not written by the secured party to the debtor but by an attorney who was no longer representing the bank. Secondly, it did not give notice that the appellant intended to retain the collateral in satisfaction of the obligation, but simply relayed information received by the attorney that a proposed settlement of the dispute had not been accepted by the appellant, and unless all of the obligations were paid in full the bank intended to take the equipment. Thirdly, it is to be noted that Ark. Stat. Ann. § 85-9-505 (2) applies only to a secured party in possession. At the time the letter was written, the appellee was still in possession of the equipment. Lastly, and of great significance, is the fact that within the twenty-one day period during which the appellee had

the right to object, the appellee filed its answer in the replevin action in which it not only objected to the retention of the collateral but to the taking itself. In that pleading they expressly counterclaim for redelivery and damages for the retention. There is no merit to appellant's contention that they were entitled to retain the collateral in satisfaction of the debt under the quoted section.

Ark. Stat. Ann. § 85-9-505 (Supp. 1979) expressly declares that when such notice has not been given or if objection to retention of the collateral as satisfaction of the debt is made, the secured party *must* dispose of the collateral pursuant to the provisions of Ark. Stat. Ann. § 85-9-504 (Supp. 1979). The appellant admittedly made no effort to comply with the provisions of the latter section.

Section 85-9-504 provides that after the default a secured party may proceed to sell, lease or otherwise dispose of the collateral, and specifies the application to be made of the proceeds of that disposition. Section 85-9-504 (2) provides that if the security interest secured an indebtedness, the secured party upon disposing of the collateral must account to the debtor for any surplus. The appellant did not comply with these requirements.

Ark. Stat. Ann. § 85-9-507 (1) (Supp. 1979) provides that if the repossessed security is not disposed of in accordance with the requirement of the code the debtor has the right to recover from the secured party any loss caused by the failure to comply. In our recent decision in *Robert Mayhew* v. *Doyle Loveless*, 1 Ark. App. 69, 613 S.W. 2d 118 (1981), we declared that the proper measure of the debtor's loss was the market value of the collateral less the balance due on the debt. We therefore hold that the trial court erred in entering judgment for the full amount of the market value without taking into consideration the balance due on the debt. The judgment should have been entered for the value of the equipment at the time of taking less the balance due on the purchase price, not by way of setoff, but as a proper application of the measure of damages.

We cannot agree that appellee's bankruptcy in any way

affected this cause of action. The record shows that although the bankruptcy court did enter a stay order against all proceedings against this appellee in the state courts by proper order, it subsequently relaxed the stay order in its entirety as to this specific case. When such a stay order is relaxed, full jurisdiction to proceed to a final conclusion is restored to the state courts.

Affirmed in part and reversed and remanded in part.

GLAZE and CORBIN, JJ., dissent.

TOM GLAZE, Judge, dissenting. This case is somewhat remarkable. In view of my research and the extensive research performed by the parties, I cannot find another case within or without our jurisdiction in which one person represented so many in a business transaction. The transaction involved multiple parties but factually is easy to follow. In 1975, James Gallman, an attorney, approached Hayden McIlroy, President of McIlroy Bank (Bank), to see if the Bank would purchase and lease construction equipment to Seven Day Builders (Builders). The equipment was to be purchased from Jeanway Industries (Jeanway). Mr. McIlroy agreed and Gallman prepared all the necessary documents. At the time of this transaction, Gallman was the attorney for Mr. McIlroy, the Bank, the Builders and Jeanway. He was also the President, majority stockholder and agent for Builders.[1] The Bank agreed to disburse $75,000 to finance the transaction, about $62,000 was paid Jeanway for the equipment, $10,000 was invested in a Certificate of Deposit in Builders' name with Gallman was trustee and approximately $2,500 went to Builders directly. Gallman drafted the lease so Builders would pay off the $75,000 in five years and he offered the Certificate of Deposit as collateral to secure the lease payments. Gallman personally guaranteed the payments, and he gave the Bank the Certificate of Deposit to help protect himself against personal liability if Builders defaulted on its payments. It is also significant to note that

---

[1] Gallman organized Builders and was its originating, sole stockholder. Before or at the time of the business transaction, a Mike Hedrick and International Properties had acquired five percent and forty-four percent respectively of the stock of Builders.

International Properties, Builders' forty-four percent minority shareholder, was involved in this original transaction to the extent that it was to loan Builders $25,000 working capital, and Gallman was to arrange all the necessary financing for Builders through the Bank. Don Couch, the President of International Properties, had discussed with Gallman the formation of Builders even before it was organized. Gallman had known and represented Couch in previous years when Couch had been in the banking business in Little Rock, Arkansas.

As mentioned above, Gallman was attorney for four of the participating parties to the business transaction, *viz.*, Hayden McIlroy, the Bank, Builders, and Jeanway. He also was an agent for Builders when the financing and business transaction was closed.

As an attorney, Gallman could conceivably represent multiple clients having differing interests.[2] In the instant case, however, given the nature of the creditor/debtor transaction in question and Gallman's relationship with each of the four participating parties, this transaction was fraught with the likelihood of litigation from its inception. Gallman admitted as much when he attempted to protect himself from personal liability on the Bank loan if Builders defaulted. More importantly, the record reflects that the Certificate of Deposit he pledged so as to limit his personal liability was purchased from the $75,000 loan proceeds, all of which became Builders' obligation to the Bank. Although Gallman testified that all parties were aware that he represented the Bank, Builders and Jeanway, there is nothing in the record which shows that he discussed the potential conflicts and pitfalls which could result from his sole handling of the transaction.

---

[2]Our Supreme Court has adopted the Code of Professional Responsibility of the American Bar Association. (Adopted Per Curiam June 21, 1976; effective July 1, 1976.) The Code actually was in effect in Arkansas after Gallman undertook to represent the parties in this cause. Ethical considerations 5-14 through 5-16 of the Code are instructive concerning instances in which a lawyer is justified in representing two or more clients having differing interests.

Even if Gallman had scrupulously followed every ethical consideration in this matter, the greater issue and concern arises because he not only was the attorney for all the parties, but also he was the agent for Builders. The law is settled that the knowledge of an agent acquired in discharge of his principal duties for a corporation is ordinarily imputed to the principal. *Ritchie Grocer Company* v. *Aetna Casualty & Surety Company*, 426 F. 2d 499 (8th Cir. 1970). Thus, it cannot be argued seriously that Builders was ignorant of nor insulated from the details of the negotiations and transaction fashioned by Gallman and entered into with the Bank. In fact, Builders' other major shareholder, International Properties, through its President, Don Couch, was actively involved in this venture from its inception. In most jurisdictions where the problem has arisen, the courts have taken the view that a borrower who initiates a usurious transaction is estopped from setting up the defense of usury. See Annot. 16 A.L.R. 3d 510, 513 (1967), which cites the following cases: *Blanks* v. *American Southern Trust Company*, 177 Ark. 832, 9 S.W. 2d 310 (1928) and *Perry* v. *Shelby*, 196 Ark. 541, 118 S.W. 2d 849 (1938). See also, *Swaim* v. *Martin*, 158 Ark. 469, 251 S.W. 26 (1923) and *Rogus* v. *Continental Illinois National Bank and Trust Company of Chicago*, 4 Ill. App. 3d 557, 281 N.E. 2d 346 (1972). From the record, there is no doubt that Builders initiated the loan/lease transaction and Gallman, its agent and attorney, prepared the documents, negotiated the percentage of interest to be charged, determined the amortization period and calculated the payments to be paid the Bank. I can conceive of no set of facts more appropriate to apply the rule of estoppel. See *Moorehead* v. *Universal C.I.T. Credit Corporation*, 230 Ark. 896, 327 S.W. 2d 385 (1959). Appellee mentions in its brief, almost in passing, that estoppel was not raised nor argued below. However, substantial evidence supporting such a defense was received without objection and is binding on appellee on the merits of this controversy. *Moorehead* v. *Universal C.I.T. Credit Corporation, supra.*

For the foregoing reasons, I would reverse.

I am authorized to state that Judge Corbin joins in this dissenting opinion.