Joyce T. FERGUSON et al *v.* Jake BRICK et al

82-288                                    649 S.W.2d 397

Supreme Court of Arkansas
Opinion delivered May 2, 1983

*Claudell Woods,* East Arkansas Legal Services, for appellants.

*McHenry, Skipper & Barns,* by: *Merl O. Barns,* for appellees.

PER CURIAM. We deny movant permission to file an amicus curiae brief. Last week we denied a similar motion. These rulings represent a slight shift in the practice of this Court and, for the benefit of the bar, we issue this per curiam opinion.

The term "amicus curiae" is old Latin which literally means "a friend of the court." 3A C.J.S. *Amicus Curiae* § 2 (1973). Historically, courts welcomed the aid of an amicus since "it is for the honor of a court of justice to avoid error." *The Protector* v. *Geering,* Hardees 85-86 (1656) 145 E.R. 394 (Ex.); *see* Note, *Amici Curiae,* 34 Harv. L. Rev. 773 n. 5 (1921). While the name has remained static, the undertaking of the amicus has changed from that of an impartial friend of the court to that of an acknowledged adversary. The transition has been discussed in three excellent law review articles. Krislov, *The Amicus Curiae Brief: From Friendship to Advocacy,* 72 Yale L. J. 694 (1963); Wiener, *The Supreme Court's New Rules,* 68 Harv. L. Rev. 20 (1954); Harper and Etherington, *Lobbyists Before the Court,* 101 U. Pa. L. Rev. 1172 (1953). Krislov, in discussing the transition, states:

> The Supreme Court of the United States makes no pretense of such disinterestedness on the part of "its friends." The amicus is treated as a potential litigant in future cases, as an ally of one of the parties, or as the representative of an interest not otherwise represented. At this level the transition is complete; at the other court levels it is in process. Thus the institution of the amicus curiae brief has moved from neutrality to partisanship, from friendship to advocacy. [Footnote omitted.]

72 Yale L. J. at 704.

The consequences of the shift have been dramatic. A form of judicial lobbying is now regularly practiced by the United States Department of Justice as well as various other groups, particularly minority groups. As stated by Krislov:

> Such briefs reached an apex of notoriety and criticism during the last half of the forties and the early

fifties. A previous rise in the number of filings was a major factor in this criticism. In a classic instance, *Lawson v. United States,* [176 F.2d 49 (D.C. Cir. 1949), *cert. denied,* 339 U.S. 934 (1950)] the problem of the Hollywood "unfriendly ten" evoked attention through amicus curiae briefs from forty organizations. Left-wing groups were both aggressive and open in their efforts to exploit the increased significance of this avenue to interest participation. The National Lawyers Guild, for example, both was and is a major filer of amicus curiae briefs. The relation of the amicus brief to standard pressure group tactics has been made even more overt. Thus, the Communist *Daily Worker* has called upon individuals to file "personal" amicus curiae briefs by writing letters directly to the Justices. Clearly, amicus briefs are merely the most formal of a number of lobbying tactics which include other devices such as the picketing utilized during the trial of Communist Party leaders under the Smith Act in New York City. Similarly in 1953, petitions were circulated by the National Committee to Secure Justice in the *Rosenberg Case.* A campaign of telegrams was part of the effort to save the life of Willie McGee, who had been sentenced to death in Mississippi. Mr. Justice Black, who had been generally sympathetic to interest group expression, found this a repugnant development and condemned the "growing practice of sending telegrams to judges in order to have cases decided by pressure." He refused to read them and noted that "counsel in this case has assured me they were not responsible for these telegrams."

The lack of discreetness here — the ignoring of the traditions and practices of the judicial process — has even been demonstrated by attorneys. Wiener characterizes a brief in *Girouard v. United States* as purposely ignoring in its preoccupation with propaganda the decisive issue on which the case turned. Similarly, the American Newspaper Publishers brief in *Craig v. Harney* [331 U.S. 367, 397 (1947)] evoked from Mr. Justice Jackson a strong response indicating that he thought its emphasis on the size and power of the

constituent newspapers was neither of legal significance nor an accident but simply intimidation. (In fairness, it should be noted that size and distribution of membership are relevant to any showing of interest in an instant case and even amicus curiae briefs are expected to represent a specified rather than a diffuse interest.) [Footnotes omitted.]

*Id.* at 710-11.

Perhaps an even more dramatic consequence of the change is the change in the attitude of the court that appoints an amicus to actively seek implementation of a decree. This consequence is described by Krislov as follows:

Indeed "friendship" at this point becomes a peculiar form of advocacy. The amicus becomes the spokesman for court interests in a vital and active sense. This is well borne out in the recent cases involving desegregation. The Supreme Court's device of delegating to the district courts the implementation of its desegregation decision has thrust upon the district courts an unusual burden of decision and activity. Where defiance has occurred, the courts have been particularly dependent upon the activities of the executive and have acknowledged this dependency.

So in both the Little Rock, Arkansas, and the University of Mississippi integration crises the federal district court, on its own initiative, designated the United States Attorney General and The United States Attorney as amici and specifically instructed its designated amici to carry out activities on behalf of the court. On September 9, 1957, in order to enforce its prior determinations the district court in Arkansas invited the Attorney General of the United States and the United States Attorney to

come into the case as [amici] curiae and to commence injunction proceedings against the Governor and his subordinates "to prevent the existing interferences with and obstructions to the

carrying out of the orders heretofore entered by this Court in this case." [*Aaron* v. *Cooper*, 163 F. Supp. 13, 16 (E.D. Ark. 1958)].

On appeal to the Court of Appeals for the Eighth Circuit, the case was styled *Faubus* v. *United States* (amicus curiae) [254 F.2d 797 (8th Cir. 1958)]. Among other claims, the attorneys for Governor Faubus argued that the United States had no standing to file such a petition for injunctive relief and that the court had erred in giving the United States such powers. The court of appeals, however, found that this was in accordance with past procedure and that it was "proper for the court to do all that reasonably and lawfully could be done to protect and effectuate its orders and judgments." The district court had acted properly in asking the law officers of the United States to act on its behalf for it "could not with propriety employ private counsel to do the necessary investigative and legal work. It has, we think, always in the past been customary for a federal district court to call upon the law officers of the United States for aid and advice in comparable situations."

There was no need to go into the legal theory too thoroughly, the court of appeals pointed out, inasmuch as the plaintiffs in the *Aaron* case were still real parties in interest and had joined the government in requesting this injunction. Nonetheless, the court of appeals emphatically upheld the authority both of the court and its amici:

> In our opinion the status of the attorney general and the United States attorney was something more than that of mere amici curiae in private litigation. They were acting under the authority and direction of the court to take such action as was necessary to prevent its orders and judgments from being frustrated and to represent the public interest in the due administration of justice. [Footnotes omitted.]

*Id.* at 718-19.

In Arkansas, this Court for many years has authorized attorneys to come into cases as amicus curiae. Although we have consistently limited their briefs to the facts proven at trial and the points raised by the parties on appeal, *Mears* v. *Little Rock School District*, 268 Ark. 30, 593 S.W.2d 42 (1980), we have traditionally welcomed these briefs for there is always the possibility that an amicus brief will have legal significance. For example, in a recent case we received 20 highly partisan amici briefs from the financial community. *McInnis* v. *Cooper Communities, Inc.*, 271 Ark. 503, 611 S.W.2d 767 (1981). At the most, two of the briefs had legal significance, while the rest were simply endorsements of the briefs filed by the parties and added nothing to the arguments except the supposed political prestige of the group making the endorsement. To knowingly allow such briefs is to invite a charge of political pressure and, in addition, waste our time.

In the federal court system there appears to be a new trend to question the filing of amici briefs, especially at the district court level. *New England Patriots Football Club, Inc.* v. *University of Colorado*, 592 F.2d 1196 (1st Cir. 1979); *Strasser* v. *Doorley*, 432 F.2d 567 (1st Cir. 1970); *Leigh* v. *Engle*, 535 F. Supp. 418 (E.D. Ill. 1982). We share in questioning the filing of amici briefs in one circumstance and, henceforth, we will deny permission to file a brief when the purpose is nothing more than to make a political endorsement of the basic brief.

The obvious difficulty with this approach is that we normally wade through the entire brief before we can know whether it serves a valid purpose. However, Rule 19 (a) requires the movant seeking permission to file as an amicus to show why such a brief is "thought to be necessary."

On the motion now before us the movant states:

1.   Mr. Jackson is a resident and a registered voter of West Memphis, Arkansas.
2.   Mr. Jackson voted in the mayoral election held on November 2, 1982.
3.   It is Mr. Jackson's good faith belief that the

mayoral election was held in a fair manner and that Leo Chitman is the duly authorized Mayor of West Memphis.

4. Mr. Jackson believes that to not retain Leo Chitman as Mayor of West Memphis would be detrimental to minority and low income persons in the state and to their belief in the political process.

5. As a citizen of West Memphis, Mr. Jackson would like to have further input into retaining Leo Chitman as Mayor of West Memphis by filing this brief.

In this particular motion for permission to file an amicus curiae brief it is obvious that the movant anticipates discussing nothing of legal significance. The proposed amicus brief would be solely for the purpose of judicial lobbying. Therefore we deny permission to file the brief.