BANK OF EVENING SHADE *v.*
Gene F. LINDSEY et ux

82-84 644 S.W.2d 920

Supreme Court of Arkansas
Opinion delivered January 10, 1983
[Rehearing denied February 14, 1983.]

*David Hodges* and *Phil Farris,* for appellant.

*Harkey, Walmsley, Belew & Blankenship,* by: *Leroy Blankenship,* for appellees.

*Rose Law Firm,* by: *Herbert C. Rule, III* and *Gary J. Garrett,* for *amicus curiae* on behalf of the appellant.

*Owens, McHaney & Calhoun,* by: *James M. McHaney,* for *amicus curiae* Arkansas Bankers Association on behalf of appellant.

STEELE HAYS, Justice. This litigation began when Mr. and Mrs. Gene Lindsey, appellees, filed suit against the Bank of Evening Shade, appellant, alleging the bank had charged eighteen percent interest on an April 11, 1980 loan

of $20,607.20, which they claimed was excessive under the Federal Deposit Insurance Act, and seeking judgment of twice the amount of interest paid. The bank answered that eighteen percent interest was permissible under the Depository Institution Deregulation and Monetary Control Act of 1980, Public Law 96-221, which became effective on April 1, 1980. The bank then counterclaimed to foreclose a deed of trust securing the note and encumbering the Lindsey home in Evening Shade. The case was transferred from law to equity and the Lindseys asserted the defense of usury, claiming the loan was not covered by the Monetary Control Act and, hence, void under Article 19, Section 12 of our Constitution of 1874. During trial the Lindsey complaint was dismissed for failure of proof and the foreclosure suit was tried solely on the issue of usury.

After the case was closed counsel for the Lindseys wrote the bank that they had elected to rescind the transaction under the Truth-in-Lending Act, 15 U.S.C. 1601, et seq., and over the bank's objection the Chancellor reopened the case for the limited purpose of taking proof on the rescission issue.

The evidence was generally undisputed that Mr. and Mrs. Lindsey had had two notes at the bank at ten percent interest secured by first and second mortgages on their home. The notes had been renewed several times and became due in March, 1980. There were discussions aimed at renewal and refinancing and the bank informed the Lindseys it would not renew at ten percent, but would make a new loan at eighteen percent, which it believed was permissible under the newly enacted Monetary Control Act, which became effective April 1, 1980. Mr. Lindsey questioned the rate of interest, but nevertheless he and his wife signed a new note at eighteen percent dated April 11, 1980, equal to the amount due on the existing notes and from which the old notes were paid off. The note was secured by a deed of trust covering the Lindsey home and other properties.

The Chancellor recognized that we have upheld the constitutionality of the Monetary Control Act of 1980 in the case of McInnis v. Cooper Communities, Inc., 271 Ark. 503,

611 S.W.2d 767 (1981) but he held the loan did not come under the act because he believed it applied only to loans which *originated* after the effective date of the act, April 1, 1980, and not to existing loans which were merely renewed after April 1. Since he found the loan was not exempted, he held it to be usurious and void. He added that if he were wrong on the usury question, he found the bank had not given proper notice to the Lindseys of their right to rescind the transaction under the Truth-in-Lending Act. On appeal, we disagree that the note was usurious or that the bank failed to give sufficient notice to the Lindseys and we reverse.

## I.

The pertinent part of the Monetary Control Act, § 501, reads:

> The provisions of the constitution or the laws of any state expressly limiting the rate or amount of interest ... shall not apply to any loan, mortgage, credit sale, or advance which is (A) secured by a first lien on residential real property . . . (B) made after March 31, 1980.

The Lindseys argue that theirs was not a new loan, but simply a consolidation and renewal of old loans and, therefore, not covered by the act. We find convincing authority to the contrary.

Pursuant to § 501 (F) of the act, the Federal Home Loan Bank Board is authorized to "issue rules and regulations and to publish interpretations governing the implementation of this section." The deference that must be given such administrative rulings is stated in *Ford Motor Credit Co.* v. *Milhollin,* 444 U.S. 555 (1980). In reversing a Court of Appeals ruling that had rejected a Federal Reserve Board's interpretation of a Truth-in-Lending provision, the Supreme Court held that, "Unless demonstrably irrational, Federal Reserve Board Staff opinions construing the Act or Regulation should be dispositive . . . " *Milhollin* at 567.

The Federal Home Loan Bank Board has issued interpretations of the type of transaction involved in this case,

and it is clear from those interpretations that on the facts of this case, the loan by the bank would qualify for exemption under the Monetary Control Act. A staff opinion interpreting the same provision of Public Law 95-161 (the temporary predecessor to Public Law 96-221) dealt with the effect of this section on renewals of short term mortgage notes which became due during the statutory preemption period. The Board stated:

> In our view, a lender would not be permitted to raise the interest rate if it is already obligated to refinance the note after maturity . . . etc. If however, the lender making such a short-term loan would not have an absolute obligation to renew or refinance a note falling due during the statutory preemption period the renewal would be the making of a new loan for the purposes of Pub. L. 161. In these circumstances, a lender would be authorized to charge interest at a rate in excess of that specified by state law. 45 FR 15921, March 12, 1980.

The Board has issued opinions for § 501 of Public Law 96-221, affirming that position. (See opinions No. S 26, March 9, 1981, and No. S 52, September 1, 1981.) We find the interpretations rational and persuasive. In this case, the loans were due in March 1980, and the bank was under no obligation to renew them. Under the above interpretation of § 501, we find the appellees' loan qualified under the act.

The appellees also argue that the legislative history of Public Law 96-221 indicates that the purpose of the act was to provide adequate housing by creating sources to finance that housing, and was not intended for other purposes. The appellees' loan was not used to acquire their home and thus they contend the loan would not come within the exemption. We cannot agree with that conclusion. The language in § 501 gives no indication that the purpose for which the loan is to be used has any bearing on qualification for the exemption. The plain language of the act states the interest limit of a state "shall not apply to *any* loan . . . " The purpose and scope of the act as stated in 12 CFR 590.1 gives no cause for so restrictive a reading and simply states the purpose is

"to ensure that the availability of [these] loans is not impeded in states having restrictive interest limitations."

Although we have found the legislative history not to support such a narrow purpose, we need not consider the history when the language, as in this statute, is unambiguous. In *H. Wetter Mfg. Co.* v. *U.S.*, 458 F.2d 1033 (1972), when the government introduced legislative history to show what Congress intended, the Court, quoting from an earlier opinion, stated:

> We may not under the guise of construction, find a Congressional intent that is contrary to the clear language employed by it. Where a statute is unambiguous, it should be given effect according to its literal language. *Wetter* at 1035.

We find the language applying the act to "any loan" unambiguous, and find no need to consider the legislative history. The loan to the Lindseys was a first lien on real property and, as provided in the act, was exempt from the interest ceiling of ten percent under our constitution.

## II.

This case was tried solely on the issue of usury. Rescission came into the case entirely as an afterthought. The Truth-in-Lending Act requires a written notice to the borrower that he has three days following any transaction which results in a mortgage on real property to notify the creditor that he elects to cancel. If the notice is not given the right to cancel continues.

During the trial the bank routinely introduced a number of documents which accompanied the transaction with the Lindseys, including a Rescission Statement which gave the required notice of their right to cancel. It was received without objection and attracted scant interest during the trial. It was a printed form with blank spaces for the appropriate dates and was proper in all respects except that it was dated April 7 and gave April 10 as the deadline for cancellation. Since the note was dated April 11, 1980 and the

Lindseys testified that all the papers were signed on the same day, there is an obvious discrepancy between the dates of the Rescission Statement and that of the note and deed of trust.

Approximately a week after trial, while the court was awaiting briefs on the issue of usury, counsel for the Lindseys wrote the bank to say the Lindseys had elected to rescind on the theory that the Rescission Statement was defective — it told them, in effect, that they had three days from April 7 in which to cancel and, thus, their right to cancel lapsed on April 10, the day before the transaction was entered into.

The Chancellor permitted the case to be reopened for a brief hearing and received the cancellation letter in evidence, commenting that he regarded it as neither highly material nor relevant. However, when he announced his decision in the usury issue, he added that if he was wrong on that point, he also thought the Rescission Statement amounted to no notice at all. None of the several issues relevant to rescission were dealt with in the final order, except for the denial of damages and attorneys' fees provided for by the Truth-in-Lending Act.

On appeal, the bank argues that the Rescission Statement was sufficient, that the loans to the Lindseys were for business purposes, which the Truth-in-Lending Act exempts, and that the Chancellor erred in reopening the case for an issue not dealt with in the pleadings or the proof, except coincidentally.

We are not inclined to second-guess the Chancellor's decision to reopen the case, as that power is necessarily broad, except to note that a complex and undeveloped issue was introduced and left largely unresolved in specific terms. There is no finding as to whether the loans were for business purposes and, therefore, exempted under the Truth-in-Lending Act, although the only proof we find is entirely consistent with the bank's argument. Nor are the equities considered, though we have held the right of rescission under the Truth-in-Lending Act is governed by equitable principles. *Nietert and Goodwin* v. *Citizens Bank and Trust*

*Co.,* 263 Ark. 251, 565 S.W.2d 4 (1978): *Turner* v. *West Memphis Federal Savings & Loan Association,* 266 Ark. 530, 588 S.W.2d 691 (1979). In *Turner* we said:

> A review of the federal cases decided under the Truth-in-Lending Act leads us to conclude an action to rescind is an equitable proceeding and the Court should look not only at the violations by the creditor but should consider the course of action taken by the debtor. From reading a history of the legislation it is apparent the Act was directed at loan sharks and fly-by-night operators.

However, we need not settle these issues, as we believe the Rescission Statement was not fatally defective, because it is clear the Lindseys were not misled by what amounted to a single and obvious mistake in the date. Mr. Lindsey's testimony provides the plausible explanation for the discrepancy. He said: "We were supposed to sign that (referring to the Rescission Statement) two or three days before, but we signed them all the same day," (p. 78) meaning April 11. Presumably the bank neglected to update the Rescission Statement and if it were at all doubtful whether the Lindseys were misled or confused because of it, then the onus of that oversight would have to rest on the bank and not on the Lindseys, but it is clear there was no misconception. Mr. Lindsey acknowledged receiving the Rescission Statement and that he understood it. (T. p. 78):

> Q. This is apparently a rescission statement that's dated April 7, 1980. Do you have a recollection as to that?
>
> A. Yeah, we signed this the same day as the loan.
>
> Q. Well, the loan was signed on April the 11th, was it not?
>
> A. We signed it on the same day.
>
> Q. But now this advised you that you under the Federal Law have a right to cancel the transaction without penalty or obligation in three business days from the

date or any later day on which all material disclosures required under the truth in lending act have been given to you. Did you understand that to be the situation in this rescission statement?

A. Yes, I understood it.

That conclusion is strengthened when the Rescission Statement itself is examined. It is in bold type with handwritten dates, and tells the Lindseys they have three days from April 7, 1980, or *any later date* on which all material disclosures required under the Truth-in-Lending Act have been given:

RESCISSION STATEMENT

THE BANK OF EVENING SHADE

EVENING SHADE, ARKANSAS

Notice to customer required by Federal law:

YOU HAVE ENTERED INTO A TRANSACTION ON *April 7, 1980* WHICH MAY RESULT IN A LIEN, MORTGAGE, OR OTHER SECURITY INTEREST ON YOUR HOME. YOU HAVE A LEGAL RIGHT UNDER FEDERAL LAW TO CANCEL THIS TRANSACTION, IF YOU DESIRE TO DO SO, WITHOUT ANY PENALTY OR OBLIGATION WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE OR ANY LATER DATE ON WHICH ALL MATERIAL DISCLOSURES REQUIRED UNDER THE TRUTH IN LENDING ACT HAVE BEEN GIVEN TO YOU. IF YOU SO CANCEL THE TRANSACTION, ANY LIEN, MORTGAGE, OR OTHER SECURITY INTEREST ON YOUR HOME ARISING FROM THIS TRANSACTION IS AUTOMATICALLY VOID. YOU ARE ALSO ENTITLED TO RECEIVE A REFUND OF ANY DOWNPAYMENT OR OTHER CONSIDERATION IF YOU CANCEL. IF YOU DECIDE TO CANCEL THIS TRANSACTION, YOU MAY DO SO BY NOTIFYING THE BANK OF EVENING SHADE AT EVEN-

ING SHADE, ARKANSAS, BY MAIL OR TELE-GRAM SENT NO LATER THAN MIDNIGHT OF *April 10, 1980.* YOU MAY ALSO USE ANY OTHER FORM OF WRITTEN NOTICE IDENTIFYING THE TRANSACTION IF IT IS DELIVERED TO THE ABOVE ADDRESS NOT LATER THAN THAT TIME. THIS NOTICE MAY BE USED FOR THAT PURPOSE BY DATING AND SIGNING BELOW.

I HEREBY CANCEL THIS TRANSACTION.

_____            _____
(Date)                                   (Customer's Signature)

It would require the utmost contortion in reasoning to interpret the Rescission Statement as telling the Lindseys that they have a legal right under federal law to cancel the transaction they are about to enter into, except that to do so, they must notify the Bank of Evening Shade by midnight on April 10, the day before, of their intent to cancel.

To his credit, and in spite of his stake in the outcome, Mr. Lindsey was not willing to say he thought his right to cancel had already expired when he signed the note on April 11, as he did not renounce his quoted testimony at the post-trial hearing. Mr. Lindsey's explanation for the mistake in dates, coupled with his own assertion that he understood the Rescission Statement, convinces us it was error to disregard it. We reverse the order of the Chancellor and remand the case for appropriate orders consistent with this opinion.