483 So.2d 732 (1986)
FIRST AMERICAN BANK & TRUST, f/k/a First American Bank of Palm Beach, a Florida Corporation, Appellant/Cross Appellee,
v.
WINDJAMMER TIME SHARING RESORT, INC., a Florida Corporation, Appellee/Cross Appellant.
No. 84-2109.
District Court of Appeal of Florida, Fourth District.
January 15, 1986.
Rehearings Denied March 17, 1986.
*734 Edna L. Caruso of Edna L. Caruso, P.A., West Palm Beach, for appellant/cross appellee.
Harris K. Solomon and Michael J. McNerney of Brinkley, McNerney & Morgan and Karen Kantner of Britton, Cassel, Schantz & Schatzman, P.A., Fort Lauderdale, for appellee/cross appellant.
HURLEY, Judge.
Appellant bank seeks to overturn a final judgment finding that it loaned money at a usurious rate of interest. The borrower, in turn, cross appeals and contends that the trial court failed to award sufficient damages. We affirm in part and reverse in part.
Windjammer borrowed $1,900,000 from the First American Bank & Trust (the bank) to finance the renovation and conversion (into time-share units) of a hotel. The money was disbursed in four separate loans: one for $150,000, one for $250,000 and two for $750,000. The interest rate on each of the loans was to float at two and one-half percent above the bank's prime rate.
This case is atypical in that Windjammer did not default on the loans. The entire $1,900,000, as well as the interest thereon, was paid in full and ahead of schedule. Shortly after making the final payment, Windjammer filed suit to recover double the total amount of interest it had paid on the loan.[1] Specifically, Windjammer claimed that the interest rate  which floated from a high of twenty-two percent when the loans were first booked, to a low of fifteen percent when the final payment was made  had on several occasions during the life of the loans exceeded the eighteen percent usury ceiling imposed by section 687.03, Florida Statutes (1983). The bank answered and, as a defense, asserted that the Florida usury statute had been preempted by enactment of the Depository Institutions Deregulation and Monetary Control *735 Act of 1980 (the act).[2] Windjammer then filed an amended complaint in which it claimed that the interest charged was usurious no matter which law applied, state or federal. Windjammer expressly referred to the interest ceiling established by § 86a of the federal act. The bank filed an amended answer with affirmative defenses. It stood by its original assertion of federal preemption, but did not cite any provisions of the act which would have exempted it from the interest ceiling in § 86a.
Prior to trial, a predecessor trial judge granted a partial summary judgment in favor of Windjammer, finding that the $150,000 "commitment fee" charged to Windjammer for servicing one of the $750,000 loans was unreasonable and, therefore, constituted interest. A successor trial judge granted, in part, the bank's motion for rehearing and retried this issue. The bank defended the fee as a reasonable fee assessed to cover its cost of issuing the loan. Windjammer, on the other hand, claimed that the fee was exorbitant and, in reality, was nothing more than additional interest on the $750,000 loan. Ultimately, the court, sitting as the trier of fact, ruled in favor of Windjammer and found the $150,000 "commitment fee" was no such thing, but rather was interest on the $750,000 loan. Thus, the trial court concluded that the bank had charged interest at a usurious rate on one of the $750,000 loans, on the $250,000 loan, and on the $150,000 loan. The court entered a final judgment to this effect and also awarded Windjammer prejudgment interest.

I.
The threshold question in preemption analysis is whether the relevant federal legislation has explicitly indicated that it is to be given preemptive effect, for "Congress may preempt state authority to act by using explicit preemptive language in a statute." Tectonics, Inc. of Florida v. Castle Construction Co., 753 F.2d 957, 961 (11th Cir.1985). Again, "it is well-established that within constitutional limits congress may preempt state authority by so stating in express terms." Pacific Gas and Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 754, 765 (1983); see also Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977).
The section of the act which is at the heart of this appeal  section 86a of 12 U.S.C.  expressly states that its provisions apply "notwithstanding any state constitution or statute which is hereby preempted for the purposes of this section... ." Thus, we hold that the 1980 Depository Institutions Deregulation and Monetary Control Act, when applicable, preempts Florida usury law.
The act, sometimes called the "usury preemption act." Quiller v. Barclays American/Credit Inc., 764 F.2d 1400, 1403 (11th Cir.1985) (Hill, J., dissenting), was designed, in part, to emancipate banks from a "Catch-22" situation which, in recent times, presented itself with increasing frequency. Faced with rising interest rates, banks were often forced to purchase money at an interest rate superior to that at which state usury law would allow it to lend the money. Obviously, this did not bode well for the banking industry. A bank cannot remain long in business if it must lend at under eighteen percent the money it borrows at twenty-two percent. Thus, Congress enacted the 1980 Depository Institutions Deregulation and Monetary Control Act. Various sections of the act  such as section 86a  specifically preempt state usury rates when those rates are set below the cost of money, (usually determined by reference to the discount rate on ninety day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where the lender is located). In Union National Bank of Laredo v. Nelson, *736 747 F.2d 310 (5th Cir.1984), the court, in reference to 12 U.S.C. § 86a, stated:
[t]he statute was enacted as part of the Depository Institutions Deregulation and Monetary Control Act of 1980 as a temporary measure designed to aid banks in making business loans where their cost of funds was greater than state usury limits. The statute addressed that problem by preempting state usury laws and substituting federal ceilings for certain loans.
747 F.2d at 313 (footnote omitted); see also 1980 U.S. Code Cong. & Ad. News, 255-56, 308-09, 3506, 3550.
The act would be impotent if it did not have the effect of preempting state ceilings. Virtually every court that has had occasion to address the issue has held that state interest-rate limits have been preempted by the 1980 Act. See, e.g., Quiller, supra; Nelson, supra; Medford v. Wholesale Electric Supply Co., 286 Ark. 327, 691 S.W.2d 857 (1985); Bank of Evening Shade v. Lindsey, 278 Ark. 132, 644 S.W.2d 920 (1983); Vickery v. Mobile Home Industries, Inc., 171 Ga. App. 566, 320 S.E.2d 633 (1984). Thus, to reiterate, we too hold that, when applicable, the 1980 Depository Institutions Deregulation and Monetary Control Act preempts state interest ceilings.

II.
Whether applying state or federal law, a court must first determine precisely what the interest is in a given case. In the case at bar, the bank challenges the trial court's determination that the $150,000 "commitment fee" was in fact interest on the one $750,000 loan.
The banking industry has developed a variety of fees and charges which accompany loans but which, for one reason or another, are not designated as interest. The determination whether such a fee  in this case, called a "commitment fee"  is really in the nature of interest is by no means a novel question. To facilitate the analysis of these fees, the courts have developed a general rule that if a service, commitment, or otherwise-designated fee which accompanies a loan represents a legitimate "reasonable" cost to the buyer (servicing the loan), then the fee will not be regarded as interest for usury purposes. See, e.g., Cumberland Capital Corp. v. Patty, 556 S.W.2d 516 (Tenn. 1977).
In Arkansas Savings & Loan Association v. Mack Truck of Arkansas, 263 Ark. 264, 566 S.W.2d 128 (1978), the lender charged a fee which it claimed covered its cost of binding itself absolutely and unconditionally to disburse the loan proceeds. The court found that the charge did not square with the real cost of such a commitment and treated the charged amount as interest. The court concluded that the charged amount was little more than additional profit on the loan and, in reality, was designed to help pay the lender's overhead expenses. A bank cannot charge fees to cover overhead; a bank can only charge the borrower for the reasonable expenses of making the loan. Anything else is interest. See, e.g., Financial Federal Savings & Loan Association v. Burleigh House, Inc., 305 So.2d 59 (Fla. 3d DCA 1974), cert. discharged, 336 So.2d 1145 (Fla. 1976), cert. denied, 429 U.S. 1042, 97 S.Ct. 742, 50 L.Ed.2d 754 (1977) (closing costs which exceeded the lender's out-of-pocket expenses treated as interest).
To determine whether a commitment fee is reasonable, it is necessary to consult the customary and acceptable practice in the trade. Financial Federal Savings & Loan Association v. Burleigh House, Inc., supra. Moreover, a court must also consider all of the facts and circumstances surrounding the fee's assessment. Kissell Co. v. Gressley, 591 F.2d 47 (9th Cir.1979). As noted in Altherr v. Wilshire Mortgage Corp., 104 Ariz. 59, 448 P.2d 859, 864 (1968):
The determination of [a commitment fee's] legality requires an ad hoc approach. Pertinent factors would be the tightness or looseness of money, the amount of the fee, the rates prevailing in the short-term money market where the *737 lender might keep the funds while waiting for the borrower to call for the loans, etc. What would be a reasonable fee at one time might be unreasonable at another. Each case must necessarily require a decision on its own facts, and no case would be authority for another with slightly different circumstances.
The bank, in the case at bar, contends that the predecessor trial judge erred by granting a partial summary judgment. Although we tend to agree with the first trial judge's ruling, we need not rest our decision on that holding because the record indicates that the successor judge retried the commitment fee issue and, based on substantial competent evidence, found that the fee was excessive and unreasonable. Indeed, the overwhelming weight of the evidence introduced below establishes that the customary practice in the industry was to charge commitment fees at a rate which ranges from one and one-half percent to (a rare) five percent of the principal of the loan. Here, the commitment fee was $150,000 on a $750,000 loan; that is a twenty percent fee, and clearly unreasonable. The court's factual determination is supported by competent, substantial and even overwhelming evidence and, thus, we concur that the fee was unreasonable and must be counted as additional interest.

III.
The bank further argues that, irrespective of the treatment afforded the commitment fee, the loans were not usurious under the federal act. In making this assertion, the bank places particular emphasis on two separate sections of the act  12 U.S.C. §§ 1735f and 1730g. Both sections provide, in essence, that state usury ceilings are suspended for certain kinds of loans. Section 1730g, (upon which the bank places the greatest emphasis), if applicable, would permit the bank to charge interest without interference from any usury ceiling. Unfortunately, however, the bank failed to cite either of these provisions to the trial court. Consequently, they cannot be considered on appeal.
Reviewing the pleadings filed below, we note that the bank raised preemption as an affirmative defense. Windjammer then filed an amended complaint which alleged that the interest charged was violative not only of the state usury ceiling, but of the § 86a federal ceiling as well. At this point, the bank had the burden of raising any other provisions in the act which might have exempted it from the usury limits imposed under § 86a. The bank failed to do so. Neither by pleading nor by proof did it raise any other provision of the act. Therefore, the bank is estopped from raising new sections  new defenses  for the first time on appeal. See, e.g., Jaffe v. Endure-A-Life Time Awning Sales, Inc., 98 So.2d 77 (Fla. 1957); Palmer v. Thomas, 284 So.2d 709 (Fla. 1st DCA 1973); Cypen v. Frederick, 139 So.2d 201 (Fla. 3d DCA 1962). The federal act is lengthy and complex; it covers one hundred and twenty-seven printed pages. Thus, we cannot accept as serious the bank's argument that a general reference to the act was sufficient to put "the judge on notice at least as to whatever is contained in the act." Tape of Oral Argument, October 18, 1985. In the same vein, we must reject out-of-hand the bank's contention that its errors of omission constitute fundamental error.
If we were to allow the bank to raise these statutory provisions for the first time on appeal, we would retroactively deprive Windjammer of its right to present evidence which might demonstrate that the loans in question did not qualify for the special treatment provided pursuant to those sections. Sections 1735f-7 and 1730g are by their language applicable only to loans which are secured by a first lien on residential property. Moreover, the sections apply, (under the facts of this case), only if the lender is insured by the Federal Depository Insurance Corporation. In addition, a lending institution "cannot obtain the benefits of preemption [pursuant to these sections] if the financing agreement contains express provisions authorizing conduct contrary to the statute or regulations." Grant v. General Electric Credit *738 Corporation, 764 F.2d 1404, 1405 (11th Cir.1985). Since the bank never raised these two sections below, Windjammer was never afforded an opportunity to present evidence to show that the sections were inapplicable in light of one or more of these theories. Consequently, we decline the bank's invitation to set aside the trial court's judgment on the basis of defenses never asserted in the trial court.

IV.
We now turn to the section of the act which the bank did raise below  § 86a. Preliminarily, the bank does not argue on appeal that, if the commitment fee is treated as interest, the loan would nonetheless be acceptable under § 86a. Therefore, we leave intact the trial court's determination that the interest charged on the $750,000 loan was usurious. The bank does, however, argue that the lower court erroneously ruled that the interest on the $150,000 and $250,000 loans was usurious. We agree.
Section 86a provides, in essence, that if the federal rate is higher than the permissible state rate, then the allowable ceiling will be five percent above the federal rate. When the $150,000 and $250,000 loans were booked, the federal rates were twenty-two percent and twenty percent, respectively, obviously higher than the eighteen percent permissible Florida rate. Therefore, under § 86a the federal ceiling was twenty-seven percent on the one, and twenty-five percent on the other. Section 86a also provides, by implication, that if the federal rate does not exceed the state ceiling, the state ceiling remains in effect.
In the instant case, during the life of the loan the federal rate dipped below the eighteen percent ceiling imposed under Florida law. The parties are at odds concerning the ramifications of this fact. At issue is whether the § 86a usury determination is based on the federal rate as of the day the loan is booked, or whether it fluctuates throughout the life of the loan. The bank contends that the permissible ceiling should be determined as of the date the loan is booked. The bank argues that the ceiling in effect the day the loan is signed remains constant throughout the life of the loan, regardless of whether the federal rate subsequently drops. Specifically, the bank contends that the twenty-five percent and twenty-seven percent ceilings in effect when the loans were signed remained the appropriate ceilings until the final payments were tendered.
Windjammer, on the other hand, argues that whenever, during the life of the loan, the federal rate drops to or below the state limit, the usury ceiling immediately drops to that state limit. Windjammer contends that since § 86a only preempts the state ceiling when the federal rate exceeds that ceiling, the day the federal rate stops exceeding that ceiling, the state usury rate is reinstated.
The trial court accepted Windjammer's position and, because the bank continued to charge interest in excess of the state ceiling (but under the federal ceiling) even after the rate dipped below the eighteen percent state limit, that court found the interest charged to be usurious. We respectfully disagree with this ruling. A lender must be able to know prospectively whether a loan it books will be in compliance with the federal usury ceiling. To subject a bank to a penalty of double the total amount of all interest paid on a loan because the federal rate may have dipped (without detection) below the state usury ceiling is, we are convinced, both unreasonable and unnecessary. Therefore, we opt for the bank's position and hold that the permissible usury limit for a loan is to be determined as of the date the loan is booked.
When the $150,000 and $250,000 loans were booked, the federal rates were twenty-two percent and twenty percent, respectively. Consequently, under § 86a, the permissible ceilings on these loans were twenty-seven percent and twenty-five percent. Based on the calculations presented in Windjammer's exhibits, it is certain that during the life of the loans the bank never *739 charged interest on either in excess of twenty-two percent, well below the relevant federal limits. We hold, therefore, that the interest charged on the $150,000 and $250,000 loans was not usurious. Accordingly, we reverse the trial court's determination to the contrary.

V.
The bank further alleges that the lower court erred in awarding Windjammer prejudgment interest on the sums recovered. Again, we agree.
An award of prejudgment interest simply is not appropriate when the court has awarded double damages pursuant to 12 U.S.C. § 86a. American Timber & Trading Co. v. First National Bank, 690 F.2d 781 (9th Cir.1982). Prejudgment interest is appropriate when the underlying recovery is compensatory in nature, but not when it is penal. Id. The purpose of a prejudgment interest award is to compensate an aggrieved party for the wrongful deprivation of the use of his or her money. Quintel Corp., N.V. v. Citibank, N.A., 606 F. Supp. 898 (S.D.N.Y. 1985); see also Channel 20, Inc. v. World Wide Towers Services, Inc., 607 F. Supp. 551 (S.D.Tex. 1985); Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Co., 607 F. Supp. 361 (E.D. Pa. 1985).
As noted by the court in American Timber, supra, however, the "double recovery provision of the Bank Act" is not compensatory, but penal:
Since its enactment over 100 years ago, this section of the Bank Act has been characterized as penal. See First National Bank of Newton v. Turner, 3 Kan. App. 352, 42 P. 936 (1985); McCreary v. First National Bank of Morristown, 109 Tenn. 128, 70 S.W. 821, 822 (1902); McCollum v. Hamilton National Bank, 303 U.S. 245, 247-49, 58 S.Ct. 568, 570-71, 82 L.Ed. 819 (1938); First National Bank in Mena v. Nowlin, 509 F.2d 872, 875 (8th Cir.1975). But see Farmers' & Mechanics' National Bank v. Dearing, 91 U.S. 29, 35, 23 L.Ed. 196 (1875).
690 F.2d at 784-85.
The American Timber court also furnished a second justification for its refusal to award prejudgment interest:
In addition, increasing penalties will increase the burden on national banks and hence may be inconsistent with the balance struck by Congress between deterrence and other goals. One of the major purposes of the Bank Act was to encourage formation of national banks by placing them on the same competitive footing as state banks. See First National Bank v. Dickinson, 396 U.S. 122, 133, 90 S.Ct. 337, 343, 24 L.Ed.2d 312 (1969); First National Bank v. Walker Bank & Trust Co., 385 U.S. 252, 261, 87 S.Ct. 492, 497, 17 L.Ed.2d 343 (1966); First National Bank in Mena v. Nowlin, 509 F.2d at 879-80. We are therefore reluctant to expand upon the remedy provided by Congress.
690 F.2d at 785. We find the foregoing analysis persuasive and, therefore, we reverse the lower court's award of prejudgment interest.

VI.
Finally, we consider Windjammer's contention that because the parties filed a stipulated agreement as to damages, the trial court exceeded its authority by modifying the agreed-to figure. We disagree.
The parties agreed to a specific damages figure if the court found the loans to be usurious. That figure included double the $150,000 commitment fee which, of course, was contingent upon the trial court's finding that the entire fee was unreasonable. The trial court, however, took a middle course. It found that all but $25,000 of the $150,000 fee was unreasonable. The court determined that $25,000, representing three percent of the $750,000, was a reasonable commitment fee and therefore excluded it from treatment as interest. Windjammer argues that the trial court had no authority to make such a determination *740 at variance with the parties' stipulation.
We disagree. It is eminently clear the stipulation was provisionally based on the trial court's findings. Indeed, the parties asked the trial court to rule on the reasonableness of the commitment fee. The court then specifically found that a portion of that fee was in fact reasonable and ought not therefore be factored into the doubling penalty. We find no impropriety in such a determination and therefore affirm the trial court on this point.
Accordingly, the judgment below is affirmed in part and reversed in part.
LETTS, J., and LEVY, DAVID L., Associate Judge, concur.
NOTES
[1] Both the state and federal usury statutes require the lender to pay double the amount of all interest collected if a loan is found to be usurious. See § 687.04, Fla. Stat. (1983); 12 U.S.C. § 86 (1980).
[2] Public Law N. 96-221, Title V § 501; 12 U.S.C. § 1735f-7 (1980).