James A. WINN and Juanita B. WINN *v.* CHATEAU
CANTRELL APARTMENT COMPANY, et al.

89-314                                              801 S.W.2d 261

Supreme Court of Arkansas
Opinion delivered December 17, 1990
[Rehearing denied January 22, 1991.*]

*Catlett, Stubblefield, Bonds & Fleming,* by: *Victor A.
Fleming,* for appellant.

*Giroir Law Firm* and *Heiskell, Donelson, Bearman, Adams,
Williams & Kirsch,* for appellee First Tennessee Bank.

*John B. Thurman,* for appellee E. Ralph Cotham, et al.

*Davidson, Horne & Hollingsworth,* for appellee Bearden,

---

*Special Justice Judith A. DeSimone would grant rehearing. Holt, C.J., and Corbin
and Brown, JJ., not participating.

Joyce, Slaydon, and Lile.

DAVID NEWBERN, Justice. This is a usury case. James A. Winn and Juanita B. Winn, the appellants, sold an apartment complex to appellee Chateau Cantrell Apartment Company (Chateau Cantrell), a general partnership, for $2,300,000, taking in return a promissory note for $1,600,000 which was secured by a mortgage.

Chateau Cantrell sold the property to Chateau Residential Partnership (Chateau Residential), through its nominee E. Ralph Cotham IV, which in turn executed a deed of trust in favor of appellee Charles T. Tuggle, Jr., trustee, and appellee First Tennessee Bank. The deed of trust provided an assignment to Chateau Cantrell of rents and profits from the complex as security. Chateau Residential also assigned rents and profits as security for its obligation to the bank. Cotham subsequently purchased the interests of the other Chateau Residential partners who took a mortgage from him to secure payment. Also joining as appellees are Mrs. E. Ralph Cotham IV, Mr. and Mrs. James R. Bearden, and Mrs. John W. Joyce, Mr. and Mrs. John E. Slayden, and Mr. and Mrs. Henry A. Lile. The Beardens, Joyces, and Liles are Mr. Cotham's mortgagees. Mrs. Cotham was named a defendant on the assertion that the Winns' interest is superior to her dower interest.

Our concern here is with a usury defense raised by Chateau Cantrell to a suit to foreclose the mortgage brought by the Winns. Payments were made on the original note from Chateau Cantrell to the Winns until 1988. When the payments to the Winns ceased, they sought foreclosure. The note from Chateau Cantrell to the Winns was to bear interest at 10% per annum from November 1, 1982, until paid. The payment clause, however, contained a compounding formula which the chancellor concluded made the interest rate usurious under Ark. Const., art. 19, § 13. The note was executed prior to the adoption of Amendment 60 which eliminated the constitutional flat 10% interest cap. The court also found that the transaction was not "a loan for business purposes" and thus the interest rate was not made legitimate by § 511 of the Depository Institution Deregulation and Monetary Control Act of 1980, 12 U.S.C.S. § 86a, which would have preempted the Arkansas law.

The Winns raise six issues on appeal. We agree with their first contention that it was error for the chancellor to hold that the transaction was not one falling within the preemption contained in § 511. We, therefore, need not consider their second contention which is that the note was not usurious under the 1982 Arkansas law. We also need not consider their third point which has to do with whether the mortgage in favor of the bank was a breach of a clause in Chateau Cantrell's mortgage to the Winns providing against further mortgages. As the mortgage in favor of the Winns takes precedence over the later ones, the trial court on remand will have to determine the extent to which the bank must reimburse the Winns for rents and profits which the bank received. The fifth point argues that the court erred in not continuing a receivership for the rents and profits from the apartment complex during the appeal. It is now moot. Lastly, the Winns contend they were erroneously denied attorney fees. Upon remand the trial court will have an opportunity to reconsider that question in light of this decision.

### 1. The partnership's note

Chateau Cantrell was a general partnership organized for the purpose of owning the apartment complex. The note and mortgage were prepared by counsel for Mr. John Flake and Flake and Company. Mr. Flake testified he was the managing general partner, and the other partners included "two physicians . . ., two or three businessmen, a financial institution service corporation was involved, as well." Flake and Company was not a partner but was hired by Mr. Flake, acting for the partnership, to manage the apartment complex. The other partners, according to Flake's testimony, were "there for investment and tax benefits," and were not to take an active role in managing the property.

The note bears Mr. Flake's signature and contains this language:

> The maker [Chateau Cantrell] acknowledges and repre-sents to the holders [the Winns] that the proceeds of the loan evidenced hereby shall be used solely for a business or agricultural purpose within the meaning of the Depository Institutions Deregulation and Monetary Control Act of 1980 and specifically Sections 511 and 512, Part B: business and agricultural loans, same as being public law

96-211, March 31, 1980, 94 Stat. 164, which law shall govern and control all issues involving all interest charged on the loan proceeds.

The lawyer who prepared the note on behalf of the partnership testified that he inserted that clause because he felt the interest specified might make the loan usurious under the Arkansas law, and he felt as a matter of "fact" the loan was being made for business purposes.

## 2. The preempting federal law

Section 511 provides:

If the applicable rate prescribed in this section exceeds the rate a person would be permitted to charge in the absence of this section, such person may in the case of a business or agricultural loan in the amount of $1,000 or more, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any such loan, interest at a rate not more than 5 percent per centum in excess of the discount rate, including any surcharge thereon, on 90-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where the person is located.

The appellees do not argue that the rate specified in the note to the Winns exceeded that allowed by this language of § 511. They do urge us to accept the trial court's conclusion that the loan evidenced by the note was not a "business loan" as contemplated by the statute. The Winns argue it is a business loan either as a matter of law or as a matter of fact. The appellees argue that the issue is one of fact and that the chancellor cannot be shown to have been clearly erroneous in deciding that the loan was not one for business purposes as contemplated by § 511.

The Winns cite a number of cases from other jurisdictions, none of which is quite on point. We are asked to infer, for example, that a mortgage loan can be a business loan from the holding in *Union National Bank of Laredo* v. *Nelson*, 747 F.2d 310 (5th Cir. 1984), that a mortgage loan was a "variable rate loan" covered by § 511 because it applied to such loans made before the current law came into effect. There was no issue as to whether the loan was a business loan. Even if a mortgage loan can

be a business loan, that does not help in deciding whether the mortgage loan in this case is a business loan. Explanation as to how each of the cited foreign cases is not quite on point would not be helpful and would unduly prolong this opinion.

The Winns' strongest citation is *Briggs* v. *Capital Savings & Loan Ass'n*, 268 Ark. 527, 597 S.W.2d 600 (1980), which was decided under the predecessor to the current § 511. Briggs was asked to participate with others in developing land Worsham had purchased and mortgaged to Capital Savings & Loan. The development plans fell through. Worsham could not make a loan payment to Capital, so Briggs loaned Worsham $6,250 to make the payment but noted on the check that it was "advance on purchase." Subsequently Worsham needed $150,000 to keep from losing the property. In order to loan Worsham this additional amount, Briggs borrowed $110,000 from Capital, using other property Briggs owned as security. A usury question arose, and the issue became whether the loan from Capital to Briggs was a business loan and thus not subject to the Arkansas usury limit because of the federal preemption.

Briggs contended he used the money from Capital to lend to Worsham just to help Worsham as a friend, but the loan application Briggs had filed with Capital contained these inserts: "commercial loan" and "cash to purchase property." In addition, Briggs had signed an affidavit to the effect that he understood the loan was a business loan within the meaning of the federal law permitting interest in excess of the maximum non-usurious interest which was 10%.

In affirming the trial court's holding in favor of Capital, we pointed out that the trial court had gone too far in declaring that any real estate loan was to be considered as a business loan for the purpose of the federal preemption. We wrote that a loan "for the purchase of a home by an individual may not be a 'business' loan. . . ." We agreed, however, that the loan was for business purposes because "Capital had every reason to believe that . . . [Briggs's] payment of the Worsham note still related to a purchase of . . . [the development property]." We treated the issue as one of fact and held that the chancellor's conclusion that it was a business loan was not clearly erroneous.

The main difference between the *Briggs* case and this one is

that here the loan was made to allow Chateau Cantrell to purchase property which was already developed whereas in the *Briggs* case it was to conduct development. In their argument that the difference is essential, the appellees cite *In re Lawson Square, Inc.*, 816 F.2d 1236 (8th Cir. 1987). First South, F.A., loaned Lawson Square, Inc., money to convert an apartment complex into condominiums for sale. A usury question arose, and the issue before the court of appeals was whether the Arkansas usury law (Amendment 60) was preempted by § 501 of the Depository Institutions Deregulation and Monetary Control Act of 1980.

■ First South argued that the loan to Lawson Square, Inc., was secured by a first lien on "residential property" and thus it was covered by the preemption found in § 501(a)(1)(A) of the act. The court of appeals agreed that the property in question was "residential." The appellees here argue that if such property qualifies as residential under § 501 the loan may not qualify as one for business purposes under § 511. We know of no authority for that proposition and can see no logic in it. No explanation is given as to why the two preemptions do not or should not overlap.

The only other citation of consequence furnished by the appellees is to an opinion issued by the General Counsel of the Federal Home Loan Bank Board, March 19, 1981. The opinion was furnished to us as an appendix to the appellees' brief, and the Winns contest its legitimacy and move that it be stricken. We need not respond to the motion to strike, as we do not find the opinion to be controlling in this case whether or not it should be authoritative.

The opinion does not contain the facts upon which it is based. It states only that it is a response to an inquiry from a supervisory agent of the Federal Home Loan Board in Little Rock. It concludes that the "nature of the loan" for purposes of determining whether it is for business purposes is to be determined by the use to which the loan proceeds will be put and states:

> The more difficult question is when does a loan have a business purpose. In construing the language in the National Bank Act, 12 U.S.C. § 85, which is virtually identical to that contained in § 511, the Office of the Comptroller of the Currency (OCC) takes the position that the loan proceeds must be used in the active conduct of

a trade or business. . . . This construction would preclude the applicability of § 511 to loans for passive investments, *i.e.*, business ventures in which the borrower will not take an active role in the operation or management of the enterprise.

Further on in the opinion, comments made by congressmen at the time the statute was enacted are discussed. Rep. St. Germain took the position that a loan by a broker to a margin investor would qualify as one for business purposes. The opinion states:

Since Rep. St. Germain's position is inconsistent with traditional interpretations, we would advise the more cautious course and confine the business loan exemption to those loan transactions in which the proceeds will be used in active business investments.

While the opinion may or may not be authoritative, it does not necessarily cover the situation before us. It does not define "passive investment." One investment perhaps thus described might be an investment in a stock or bond purchased on a public exchange. The average investor takes no active part in operation or management of AT&T. That is unlike the sort of investment we have here. The Chateau Cantrell partners could be said to be engaged in an "active business investment" albeit they are operating the apartment complex through Mr. Flake's company as agent. The opinion, by saying that "active business investments" are included in loans for business purposes clearly does not exclude all loans for "investment" purposes, and thus we would not find it helpful even if we were to rule it acceptable as authoritative.

### Conclusion

■■ We agree with the Winns that our decision should be controlled by the *Briggs* case. We can see no significant distinction between the use to which the money was to be put by the borrowers here and the borrowers there. The *Briggs* case opinion recites nothing to the effect that Briggs and the others Capital was led to believe were engaged in a land development project intended to do the development personally. We have no quarrel with the facts found by the chancellor, but in a *de novo* review we are free to reach a different result required by the law. *Ferguson*

v. *Green*, 266 Ark. 556, 587 S.W.2d 18 (1979); *Larey, Comm'r v. Cont. Southern Lines*, 243 Ark. 278, 419 S.W.2d 610 (1967). We do so here. Mr. Flake, the managing general partner, testified that he was in the business of buying, selling, and organizing the management of real estate properties. He derived part of his income from just such activities as this one. The fact that other partners motives were based on tax avoidance and "investment" does not, in our view, lessen the "business loan" nature of this transaction. Not only could the Winns have believed from the circumstances that Mr. Flake and his partners were buying the apartment complex for business purposes, that very declaration was made by the partnership in the note.

The case is remanded for the chancellor to sort out the entitlements to rents and profits as well as to rule on the question of attorneys' fees.

Reversed and remanded.

HOLT, C.J., not participating.

Justice GLAZE and Special Justice JUDITH A. DeSIMONE dissent.

JUDITH A. DESIMONE, Special Justice, dissenting. While the majority opinion has summarized the salient facts of the case, a few details provide insight into the background of the unique provision in the $1,600,000.00 promissory note and mortgage at the heart of this case. At the outset of negotiations, the sellers of the apartment complex were asked for special consideration by the buyer. The special consideration requested was a reduction in payments to be made over the first two years of the mortgage. Sellers were amenable to this request, but asked, in return, for some interest on their partially-forgiven sums. The buyer, a general partnership, agreed, and an attorney for one of those general partners was asked to draw the appropriate papers.

The provision at issue read as follows:

"Payable for the first twenty-four (24) months in equal installments of $10,666.67 per month, payable on the first day of each month, commencing on December 1, 1982, such payments to be applied to interest only, with unpaid interest accruing and compounding at the rate of ten

percent (10%) per annum for said twenty-four (24) months only; thereafter, payable in equal installments of interest only of $13,333.33 per month for ninety-six (96) months, with the entire principal plus interest thereon at the rate of ten percent (10%) per annum due November 1, 1992, and in addition, an amount equal to the unpaid and compounded interest which accrues during the first twenty-four (24) months following the date of this Note shall be due and payable November 1, 1992."

The drafting attorney recognized a potential usury problem, and purposefully inserted language that purportedly classified the loan as one for "business purposes" under the Depository Institutions Deregulation and Monetary Control Act of 1980, the pertinent provision of which reads as follows:

12 U.S.C.S. §86a (a):

If the applicable rate prescribed in this section exceeds the rate a person would be permitted to charge in the absence of this section, such person may in the case of a business or agricultural loan in the amount of $1,000 or more, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any such loan, interest at a rate of not more than 5 per centum in excess of the discount rate, including any surcharge thereon, on 90-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where the person is located.

If the enterprise were determined to fall within the classification "business" under the Act, it would be exempt from the State's constitutional limitation on interest charges.

The buyer, Chateau Cantrell Apartment Company, was a general partnership organized for one purpose, purchase and sale of the Chateau Cantrell Apartment complex. That purpose came to total fruition approximately one year later, when the partnership was sold. Evidence adduced revealed that one of the general partners had an extensive real estate development background, and in fact owned a real estate development company, which company was hired to manage the Chateau Cantrell complex. There is no evidence, however, that any of the general partners

took an active role in the management of the complex.

For the determination of whether the enterprise fits the classification "business" under the Monetary Control Act, the Court has been cited to an Opinion issued by the General Counsel of the Federal Home Loan Bank Board, March 19, 1981, *S34*. That authority has been termed "convincing" in a relatively recent decision, *Bank of Evening Shade* v. *Lindsey, et ux.*, 278 Ark. 132, 644 S.W.2d 920 (1983), which decision quoted from *Ford Motor Credit Co.* v. *Milhollin*, 444 U.S. 555 (1980), asserting that such an administrative opinion should be dispositive "unless demonstrably irrational." *Milhollin* at 567.

The March 19, 1981, Opinion of the General Counsel of the Federal Home Loan Bank Board responded precisely to an inquiry as to the meaning of the term "business" under the Monetary Control Act. As noted by the Majority, that General Counsel advised that the nature of a loan is determined by the use to which the loan proceeds will be put, *i.e.*, whether for a business purpose. *S34 Opinion*, p. 1. Loan proceeds should be used "in the active conduct of a trade or business,. . . ." precluding the applicability of this statute to loans for passive investments or those where a borrower did not take an active role in the operation or management of the business. *Id.* The General Counsel looked to similar interpretations of the *National Bank Act, 12 U.S.C. Sec. 85*, which contained the identical provision regarding "business" as the Monetary Control Act. Counsel pointed out that drawing on such interpretations by the Office of the Comptroller of the Currency was consistent with tax law distinctions between business and non-business activities. *Id.* Further, the General Counsel looked toward interpretation of business loans under the Truth in Lending Act, and detailed case decisions analyzing the individual facts and circumstances presented, which decisions apparently turn on the degree of active management. *Id.*, p. 2. *See, for example, Sapenter* v. *Drayco, Inc.*, 326 F. Supp. 871 (E.D. La.), *aff'd without opinion*, 450 F.2d 941 (5th Cir. 1971), *cert. denied*, 406 U.S. 920 (1972).

Whatever the degree of personal involvement of the principals in the case of *Brigg's* v. *Capital Savings and Loan Ass'n*, 268 Ark. 527, 597 S.W.2d 600 (1980), it is clear that *development* was part of the enterprise purpose. In this case, the purchase and

resale of the Chateau Cantrell Apartment complex was the sole purpose. After several hearings, the Chancellor below found that the buyer, Chateau Cantrell Apartment Company had only one asset, "that being the Chateau Cantrell Apartment complex, . . . and . . . did not manage, construct, renovate, or operate the apartment complex."

In rejecting the active/passive guidepost provided by the General Counsel, the majority provides no criteria with which to analyze such an enterprise, leaving advising attorneys to incorporate "words of art" into documents in order to persuade future reviewing courts that an otherwise problematical agreement will pass muster under an appropriate statute. The potential that form will triumph over substance provides slight encouragement for those same attorneys to suggest agreements structured so as to avoid such provisions as those which initiated these proceedings.

In view of the patently rational analysis of the General Counsel, *See, Bank of Evening Shade* v. *Lindsey, supra*, I would affirm the reasoning of the Chancellor below, and hold that this note and mortgage involved a loan which was not "for business or agricultural purposes within the meaning of *12 U.S.C. Sec. 86A*", and that the key provision was clearly usurious under the Arkansas Constitution.

GLAZE, J., joins in this dissent.